**MAGNANIMO DEAN LAW, APC**
Lauren A. Dean, Esq. (SBN 174722)
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Email: lauren@magdeanlaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MANNING II, Derivatively on Behalf of EMBARK TECHNOLOGY, INC. (f/k/a NORTHERN GENESIS ACQUISITION CORP. II.), | Case No: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| IAN ROBERTSON, KEN MANGET, CHRIS JARRATT, PAUL DALGLISH, ROBERT SCHAEFER, BRAD SPARKES, ALEX RODRIGUES, RICHARD HAWWA, ELAINE CHAO, PAT GRADY, and BRANDON MOAK, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and, | |
| EMBARK TECHNOLOGY, INC. (f/k/a NORTHERN GENESIS ACQUISITION CORP. II), | |
| Nominal Defendant. | |

Plaintiff Robert Manning II ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Embark Technology, Inc. ("Embark" or the "Company"). Embark was f/k/a Northern Genesis Acquisition Corp. II ("NGA").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Embark with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Embark against certain of its former and current officers and directors seeking to remedy Defendants' (defined below) violations of state and federal law that began on or about January 1, 2021 and continued through the present (the "Relevant Period"), and which have caused substantial harm to the Company.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with principal executive offices in this District and conducting business and maintaining operations in this District, or he or she is an

individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Embark is headquartered in this District.

## BRIEF BACKGROUND

7.     NGA, a Special Acquisition Company (a "SPAC company"), had its initial public offering on January 15, 2021.  It sold the units at a price of $10 per unit generating $414 million in gross proceeds received by the Company.

8.     The original corporate version of Embark (hereinafter, "Legacy Embark") was founded as a startup company in 2016, designed to function as an autonomous vehicle company that builds software for autonomous trucks.

9.     NGA filed a merger agreement with Legacy Embark on June 22, 2021.

10.     On November 10, 2021, NGA officially merged (the "Merger") with Legacy Embark, and changed its name to Embark Technology, Inc.  The shares of common stock are listed on the stock market under the symbol "EMBK."

## THE PARTIES

**Plaintiff**

11.     *Plaintiff Robert Manning II* is, and was at relevant times, a shareholder of Embark.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

12.     *Nominal Defendant Embark* is a Delaware corporation, headquartered at 424 Townsend Street, San Francisco, California.  The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EMBK.

**NGA Defendants**

13.     **Defendant Ian Robertson** ("Robertson") has served on the Company's Board since November 2021. Defendant Robertson is a member of the Company's Audit and Nominating and Corporate Governance Committees.  Defendant Robertson served as NGA's Chief Executive Officer ("CEO") and a member of its Board until the Merger.

14.     **Defendant Ken Manget** ("Manget") served as NGA's Chief Financial Officer ("CFO") from before the Merger until the Merger. Manget also served on NGA's Board from June 2020 to November 2021.  Defendant Manget had a non-controlling interest and owned 10,350,000 founder shares of common stock.

15.     **Defendant Christopher Jarratt** ("Jarratt") served on NGA's Board and was Chair of the Board from November 2020 to November 2021. According to the Initial Statement of Beneficial Ownership of Securities, Defendant Jarratt had a non-controlling interest and owned 10,350,000 founder shares of common stock.

16.     **Defendant Paul Dalglish** ("Dalglish") served on the NGA's Board from June 2020 to November 2021.  Defendant Dalglish had a non-controlling interest and owned 10,350,000 founder shares of common stock

17.     **Defendant Robert Schaefer** ("Schaefer") served on NGA's Board from July 2020 to November 2021.  Defendant Schaefer had a non-controlling interest and owned 10,350,000 founder shares of common stock.

18.     **Defendant Brad Sparkes** ("Sparkes") served on NGA's Board from June 2020 to November 2021.  Defendant Sparkes had a non-controlling interest and owned 10,350,000 founder shares of common stock

19.     Defendants Robertson, Manget, Dalglish, Jarrett, Schaefer and Sparkes are hereinafter referred to as the "NGA Defendants."

**Embark Defendants**

20.     **Defendant Alex Rodrigues** ("Rodrigues") is the CEO of Embark and has served on Embark's Board since November 2021. Defendant Rodrigues was also the Co-founder and the CEO of Legacy Embark. According to the Company's proxy

statement, dated April 26, 2022 (the "2022 Proxy Statement"), Defendant Rodrigues beneficially owns 50,034,332 shares of the Company's class B common stock, approximately $255 million worth of Company stock. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Rodrigues received $57,391,582 in total compensation from the Company. This included $180,000 in salary and $57,211,582 in stock awards.

21. **Defendant Richard Hawwa** ("Hawwa") has been the Company's CFO since November 2021. Defendant Hawwa served as the Legacy Embark's CFO from May 2021 until November 2021. According to the 2022 Proxy statement, Defendant Hawwa owns 1,211,846 shares of the Company's class A common stock, approximately $6.2 million worth of Company stock. For the 2021 Fiscal Year, Defendant Hawwa received $37,726,346 in total compensation from Embark. This included $228,846 in salary, $87,500 in bonus, and $37,410,000 in stock awards.

22. **Defendant Elaine Chao** ("Chao") has served on the Company's Board since November 2021. Defendant Chao is also a member of the Company's Audit Committee. Defendant Chao also served on the Legacy Embark's board. According to the 2022 Proxy statement, Defendant Chao owns 419,485 shares of the Company's class A common stock, approximately $2.1 million worth of Company stock. For the 2021 Fiscal Year, Defendant Chao received $2,427,953 in total compensation from the Company. This included $100,698 in fees earned or paid in cash and $2,327,254 in stock awards.

23. **Defendant Pat Grady** ("Grady") has served as a Company director since November 2021. Defendant Grady was also the chair of the Board's Compensation Committee and is a member of the Board's Corporate Governance Committee. According to the 2022 Proxy statement, Defendant Grady beneficially owned 53,886,635 shares of the Company's class A common stock which accounts for 14.9% of Embark's total Common A stock, approximately $275 million worth of Company stock.

24. **_Defendant Brandon Moak_** ("Moak") is the Company's Chief Technology Officer and has served as a Company director since November 2021. Defendant Moak is also co-founder of Legacy Embark and served as its Chief Technology Officer. According to the 2022 Proxy statement, Defendant Moak owns 37,044,649 shares of the Company's class B common stock, approximately $189 million worth of Company's stock. For the 2022 Fiscal Year, Defendant Moak received $30,985,652 in total compensation from Embark. This included $180,000 in salary and $30,805,652 in stock awards.

25. Defendants Rodrigues, Hawwa, Chao, Grady, Moak are collectively referred to as the "Embark Defendants".

26. The NGA Defendants and the Embark Defendants are collectively referred to as "the Individual Defendants" and with Nominal Defendant Embark, collectively "the Defendants."

## FACTS

**Background of NGA and the Merger**

27. A SPAC is a public shell company that is created to acquire private operating companies with the intention to bring those private operating companies public. SPACs are also referred to as a "blank check company" because it has cash, but no business operations other than the intention to acquire another operating company.

28. A SPAC IPO is often structured to offer investors a unit of securities consisting of (i) shares of common stock and (ii) warrants. A warrant is a contract that gives the holder the right to purchase from the company a certain number of additional shares of common stock in the future at a certain price, often a premium to the current stock price at the time the warrant is issued.

29. In a SPAC IPO, investors put their capital into a listed company that does not actually conduct any commercial activities. Because the business the SPAC will be acquiring is unknown at the time of the IPO, the investors in the IPO are essentially

placing trust in the incorporators and management of the SPAC.  A SPAC does not have operations or assets other than cash and limited investments.  It offers securities for cash and places substantially all the offering proceeds into a trust or escrow account for future use in the acquisition of one or more private operating companies.

30.     The SPAC will identify target companies and attempt to complete one or more business combination transactions, after which, the SPAC will continue the operations of the acquired company or companies as a public company.  A SPAC typically provides an 18-to-24-month period to identify and complete an initial business combination transaction.

31.     The incorporation documents or the equity agreements of a SPAC requires the public shareholders of the SPAC to vote on a transaction.  That triggers pre-merger regulatory filings with financial reporting and disclosures.  SPACs are regulated by the SEC and are required to follow Generally Accepted Accounting Principles ("GAAP").

32.     According to the GAAP guidelines, for an entity to determine whether to classify shares issued in the legal form of equity as liability instruments, it needs to consider if it represents (i) mandatorily redeemable financial instruments under ASC 480-10-25-14 or (ii) unconditional obligations to deliver a variable number of equity shares that are liabilities under ASC 480-10-25-14.  As SPACs are regulated by the SEC and need to register with the SEC, they need to consider the possibility that shares issued in the legal form of equity may require classification as temporary equity instruments under ASC 480- S99-3A if they are redeemable: (a) at a fixed or determinable price on a fixed or determinable date, (b) at the option of the holder, or (c) upon the occurrence of an event that is not solely within the control of the issuer

33.     NGA, a SPAC company, had its initial public offering on January 15, 2021. It sold the units at a price of $10 per unit generating $414 million in gross proceeds received by the Company.

34. NGA filed a prospectus with the SEC in connection with the Company's IPO, which the prospectus stated that its management team has significant experience in identifying and acquiring a business. It further stated that for evaluating prospective businesses, NGA will conduct a thorough due diligence review to determine if the business is worth acquiring or not. NGA's purpose was to acquire a business that had an ability to succeed if it were managed by NGA's team, network, and expertise.

35. Legacy Embark was founded as a startup company in 2016, designed to function as an autonomous vehicle company that builds software for autonomous trucks.

36. NGA filed a merger agreement with Legacy Embark on June 22, 2021. NGA and Legacy Embark issued a joint press release on June 23, 2021, in which the Company assured the market that it will work with Legacy Embark and make sure it transitions to a "great public company."

37. On November 10, 2021, NGA officially merged (the "Merger") with Legacy Embark, and changed its name to Embark Technology, Inc. The shares of common stock were listed on the stock market under the symbol "EMBK." On November 18, 2021, the closing sale price of shares of the Class A common stock was $7.17. Company's warrants were listed on the stock market under the symbol "EMBKW." On November 18, 2021, the closing sale price of the warrants was $1.34.

**NGA Misclassified Material Information in its Financial Reports**

**Leading up to the IPO (the Misclassification Misconduct)**

38. A SPAC charter often has a provision that provides the SPAC cannot redeem public shares that would cause its net tangible assets to be less than US $5,000,001 following such redemptions. NGA had the same provision in its charter. NGA's Registration Statement, stated that under the NGA Existing Charter, public holders of NGA public shares may elect to have their NGA public shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by

dividing (i) the aggregate amount on deposit in the Trust Account as of two business days prior to the consummation of the Business Combination (including interest net of taxes payable), by (ii) the total number of NGA public shares (the "Redemption Payment"); provided that NGA will not redeem any shares of NGA Common Stock to the extent that such redemption would result in NGA having net tangible assets (as determined in accordance with Rule 3a51-1(g) (1) of the Exchange Act) of less than $5,000,001. As of 2021, the Redemption Payment would have amounted to approximately $10.00 per share.

39. The Company, however, later admitted that the redeemable shares described in its financial statements that were issued as of January 15, 2021 and March 31, 2021 were not correctly classified. NGA incorrectly classified the portion of its public shares as permanent equity so it could maintain stockholders' equity greater than $5,000,000. It was necessary for NGA to maintain its stockholders' equity above $5,000,000 because NGA could only complete its Merger with Legacy Embark if NGA had net tangible assets if at least $5,000,001 under its charter. Thus, in order to continue to exist as a SPAC company, NGA incorrectly classified some of its public shares as "shares not subject to redemption." This misconduct is referred to herein as the "Misclassification Misconduct."

40. An entity can classify its securities in one of the following three categories: liability, permanent equity, and temporary equity. The classification on the balance sheet is important because it affects a company's financial statements. If a company classifies its securities as a liability, then the return on investment is reflected in the net income category, whereas if a company classifies its securities as equity, then the returns on investment are generally reflected in the equity category, without having any impact on the net income.

41. In addition, when the securities are classified as temporary equity, it may affect an entity's reported earnings per shares ("EPS") because adjustments to the

redemption amount are often treated as dividends which can change the proper method and outcome in calculating the EPS.

42.    EPS is a fundamental measure of the health and profitability of any corporation.  EPS is a financial ratio that calculates how much earnings a company is generating per share.  In other words, it is a measurement used to inform shareholders how much money they would likely receive if the company were to be liquidated. However, the NGA Defendants' Misclassification Misconduct directly affected NGA's EPS.

**The Overpayment Misconduct**

43.    As noted above, NGA had no operations of its own, but instead sought to combine with an operating company and take on that company's operations as its own. In such a transaction, the operating company, here Legacy Embark, benefits from the business combination by getting access to the investment funds raised by the SPAC, here NGA, without being subjected to the more formal requirements imposed in bringing a private company public via the initial public offering process ("IPO"). The SPAC, here NGA, benefits if the combination with the target company is prudent and enhances the value of the SPAC's shares.

44.    According to the Merger agreement filed on June 22, 2021, NGA agreed to acquire Legacy Embark for a base purchase price of $4.25 billion.  Pursuant to the Preliminary Proxy Statement, the terms of the merger agreement between NGA and Legacy Embark provided, *inter alia*, as follows:

> [E]ach share of Embark common stock that is issued and outstanding immediately prior to the Effective Time (other than (i) any shares of Embark common stock subject to Embark Awards or warrants, (ii) any share of Embark common stock held in the treasury of Embark immediately prior to the Effective Time ("Treasury Shares"), which shall be canceled as part of the Business Combination, and (iii) any shares of Embark common stock electing to demand statutory appraisal rights due

to the Business Combination ("Dissenting Shares")) (collectively, the "Exchange Shares"), will be canceled and converted into the right to receive the applicable portion of the number of shares of Embark Technology Common Stock equal to an exchange ratio equal to the quotient of (i) (a) the base purchase price of $4,250,000,000 (as adjusted pursuant to the terms of the Merger Agreement) *divided by* (b) $10.00 (the "Aggregate Merger Consideration") and the Aggregate Fully Diluted Company Common Shares (as defined in the Merger Agreement) (the "Exchange Ratio"). Each holder of Exchange Shares shall have its Exchange Shares converted into either (i) Embark Technology Class A Common Stock, or (ii) Embark Technology Class B Common Stock.

45.     The Merger closed on November 10, 2021, on the terms set forth in the Merger agreement.  NGA acquired all of the outstanding equity interests of Legacy Embark for approximately $4.25 billion in aggregate consideration.

46.     These terms were unfavorable and unreasonable to NGA's shareholders, given that Legacy Embark suffered from numerous financial and operational deficiencies. A report issued by The Bear Cave (the "Bear Cave Report")) published on January 6, 2022 stated that "Embark appears to lack true economic substance," and that the "company holds no patents, has only a dozen or so test trucks, and may be more bark than bite."  The Bear Cave Report further stated that Embark's technology underlying its business operations was based on puffery rather than actual substance.

47.     All those issues made Legacy Embark a less valuable acquisition than NGA's shareholders were led to believe.

48.     Legacy Embark relied heavily on its trade secrets and technological methods to run its business, but it held no patents.  Legacy Embark relied on the fact that it could keep its competitors from reverse engineering its products.  If Legacy Embark's trade secrets were to be disclosed in the future or a third-party reverse

engineered the technology Legacy Embark heavily relied on, Legacy Embark had no right to prevent a third party from using it.

49.     Furthermore, the autonomous driving technology is highly complex and new. The industry faces significant regulatory and technological challenges.  Legacy Embark's autonomous driving technology and related hardware and software could have undetected defects, errors or bugs in hardware or software. If any of these potential defects materialized, Embark would incur significant development, repair, and replacement costs.  Not only that, but also it exposed Embark to tremendous future litigation costs including breach of contract, product liability, and tort liability. The Merger Prospectus stated that:

> Additionally, there may be undetected errors or defects especially as it introduces new systems or as new versions are released. These risks are particularly significant in the freight transport market given the high potential value of each load, as any such errors or defects could result in costly delays or losses, leading to the delay or prevention of the adoption of autonomous driving technology in trucks. There can be no assurance that Embark will be able to detect and fix any defects in its products prior to their sale to or installation for customers.  Errors or defects could result in costly delays or losses, leading to the delay or prevention of the of the adoption of autonomous driving technology in trucks. There can be no assurance that Embark will be able to detect and fix any defects in its products prior to their sale to or installation for customers. Errors or defects in Embark's product may only be discovered after they have been tested, commercialized, and deployed.

50.     NGA Defendants knew or should have known that Legacy Embark's management team and existing Board had limited experience managing a public company.  Defendant Robertson was the only NGA member that served on the Board of Embark.  The Merger Prospectus stated that:

Legacy Embark may be subject to risks associated with potential future strategic alliances, partnerships, investments or acquisitions, all of which could divert management's attention, result in Embark incurring significant or acquisitions, all of which could divert management's attention, result in Embark incurring significant costs or operating difficulties and dilution to its stockholders, disrupt its operations and adversely affect its business, results of operations or financial condition.

51.     In light of these issues, the NGA Defendants breached their fiduciary duties to NGA by causing NGA to merge with Legacy Embark on terms that were unfavorable to the Company and its pre-Merger shareholders.

52.     Furthermore, it was highly likely that if Legacy Embark's autonomous vehicle technologies fail to perform as expected, were inferior to those of its competitors, or were perceived as less safe or more expensive than those of its competitors or non-autonomous vehicles, Embark's financial performance and prospects would be adversely impacted in the future.

53.     The NGA Defendants were required to know the true state of Legacy Embark's operation and financial prospects prior to the Merger in the course of conducting due diligence.  However, despite knowing the poor state of affairs at Legacy Embark and the heightened risk of future problems, NGA Defendants agreed to the Merger.

54.     In breach of their fiduciary duties to the Company, the NGA Defendants engaged in the Overpayment Misconduct by causing NGA to acquire Legacy Embark on unfavorable terms despite the fact that, *inter alia*: (i) Legacy Embark had no patents or significant testing trucks; (ii) Legacy Embark was working with autonomous driving technology that is highly complex and faced significant regulatory and technological challenges; and (iii) Legacy Embark had an unproven business model and limited operating experience.

**FALSE AND MISLEADING STATEMENTS**

**July 2, 2021 Registration Statement, Proxy Statement and Prospectus**

55.    On July 2, 2021, NGA filed its Registration Statement.  The Registration Statement was signed by Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, and Sparkes.

56.    The Registration Statement included a Preliminary Proxy Statement and a prospectus.  Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer and Sparkes solicited the preliminary Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

57.    On August 31, 2021, September 23, 2021 and October 10, 2021, NGA filed amendments to its Registration Statement (the "Amendments to the Form S-4").

58.    The Preliminary Proxy Statement stated the following with regards to the Code of Ethics:

> NGA has adopted a code of ethics that applies to all of its executive officers, directors, and employees. The code of ethics codifies the business and ethical principles that govern all aspects of its business.

59.    The Preliminary Proxy Statement further stated:

> Embark Technology will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics will be available on Embark Technology's website, http://Embark.com/investors. Embark Technology intends to make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its website rather than by filing a Current Report on Form 8-K.

60.    With regards to NGA's Merger with Legacy Embark, the Preliminary Proxy Statement presented the proposal for the Merger stating that:

Proposal No. 1 — The Business Combination Proposal — to consider and vote upon a proposal to approve and adopt the Agreement and Plan of Merger, dated as of June 22, 2021 (the "Merger Agreement"), by and among NGA, NGAB Merger Sub Inc. ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of NGA and Embark Trucks Inc. ("Embark"), a Delaware corporation, a copy of which is attached to this proxy statement/prospectus statement as Annex A. The Merger Agreement provides for, among other things, the merger of Merger Sub with and into Embark (the "Merger"), with Embark surviving the Merger as a wholly owned subsidiary of NGA (following such date, Embark Technology), in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in this proxy statement/prospectus (the "Business Combination Proposal")

61. The Preliminary Proxy Statement further stated that:

After careful consideration, the board of directors of NGA has unanimously approved the Business Combination and unanimously recommends that stockholders vote "FOR" adoption of the Merger Agreement, and approval of the transactions contemplated thereby, including the Business Combination, and "FOR" all other proposals presented to NGA's stockholders in this proxy statement/prospectus. When you consider the recommendation of these proposals by the board of directors of NGA, you should keep in mind that NGA's directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. See the section entitled "Proposal No. 1—The Business Combination Proposal — Interests of Certain Persons in the Business Combination" in this proxy statement/prospectus for a further discussion of these considerations.

62.     Regarding the redeemable public shares, the Preliminary Proxy Statement stated:  "In addition, pursuant to the NGA Organizational Documents, in no event will NGA redeem public shares in an amount that would cause NGA's net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) to be less than $5,000,001."

63.     Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer and Sparkes caused the Preliminary Proxy Statement to be materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading.

64.     Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes caused the Preliminary Proxy Statement to be false and misleading by failing to disclose that the Code of Ethics was not obeyed as shown by the accounting errors discussed herein and the fact that the NGA Defendants were engaging in the Overpayment Misconduct, soliciting the Merger with Legacy Embark without having conducted adequate due diligence.

65.     The Preliminary Proxy Statement contained material errors that required Embark to issue a restatement for such financial statements to be in accordance with GAAP and failed to disclose that: (i) the impact of the error on the financial statements as of and for the three and six month periods ended June 30, 2021, or as of and for the three and nine month periods ended September 30, 2021; (ii) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the NGA or its successor company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (iii) the disclosures failed to mention that NGA violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (iv) NGA failed to maintain adequate internal controls.

66.     The misleading statements and omissions were not corrected in any of the Amendments to the Form S-4.

**October 19, 2021 Definitive Proxy Statement/Prospectus**

67.     On October 19, 2021, the definitive proxy statement/prospectus on the Form 424B3 was filed with the SEC ("Definitive Proxy Statement"), as to the Merger because the SEC concluded that the redeemable common shares in SPACs should all be recorded as temporary equity. Defendants Robertson and Rodrigues signed the Definitive Proxy Statement.

68.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at the three and six month periods ended June 30, 2021 had a total stockholder's equity balance of $5,000,005 as of March 31, 2021.  However, this was false because the actual balance was ($37,455,393), which was restated after adjusting the carrying amount of stockholders' equity and reducing it by ($42,455,398).

69.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at the three and six month periods ended June 30, 2021 had a total stockholders' equity of $371,629,911 for the sale of 41,400,000 units, net of underwriting discounts. However, this was false because the actual total stockholders' equity was $0, which was restated after adjusting the carrying value and reducing it by ($371,629,911).

70.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at the three and six month periods ended June 30, 2021 had a total stockholders' equity of ($365,248,633) for the initial value of common stock subject to redemption. However, this was false because the actual carrying value was $0, after a $365,248,633 adjustment.

71.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at

the three and six month periods ended June 30, 2021 had a total stockholder's equity of ($6,295,969) for the change in value of common stock subject to redemption during the first quarter of 2021. As restated, there was no need for such an adjustment, and as such, this line item was reported as $0.

72.     The Definitive Proxy Statement and the Amendments to the Form S-4 failed to mention the accretion for common stock to redemption amount as of March 31, 2021 in NGA's Condensed Statement of Changes in Stockholders' Equity at the three and six month periods ended June 30, 2021. However, the Company's accounting errors required the Company to adjust this period, which it did in the restatement and adjusted the amount by ($42,359,126) to the new balance of ($42,359,126).

73.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at the three and six month periods ended June 30, 2021 had a total stockholder's equity of ($42,455,398) for the change in value of common stock subject to redemption during the second quarter of 2021.  As restated, however, there was no need for such an adjustment; therefore, this line item was reported as $0.

74.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's Condensed Statement of Cash Flows for the six month period ended June 30, 2021 had $365,248,633 in initial classification of common stock subject to possible redemption.  As restated, however, it was $414,000,000 after a $48,751,367 adjustment to correct the carrying value of such common stock.

75.     The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's Condensed Statement of Cash Flows for the six month period ended June 30, 2021 had $48,751,367 change in value of common stock subject to redemption. However, this was false because the actual value was $0 after adjusting it for ($48,71,367).

76.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted net income per share, Common Stock subject to redemption" as of and for the three and six month periods ended June 30, 2021 in NGA's Condensed Statements of Operations as ($0.84) and ($0.51), respectively. However, that was false because the Company corrected it in the restatement to ($0.24) and ($0.15), respectively.

77.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted weighted average shares outstanding, Common stock subject to redemption" as of and for the three and six month periods ended June 30, 2021 in NGA's Condensed Statements of Operations as 37,153,752 and 61,945,851, respectively. However, this was false because the actual values were 41,400,000 and 37,969,061, respectively.

78.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted net income per share, Non-redeemable common stock" as of and for the three and six month periods ended June 30, 2021 in NGA's Condensed Statements of Operations as ($0.84) and ($0.51), respectively.  However, this was false because the actual restated amounts were ($0.24) and ($0.15), respectively.

79.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted weighted average shares outstanding, Non-redeemable common stock" as of and for the three and six month periods ended June 30, 2021 in NGA's Condensed Statements of Operations as 14,596,248 and 14,393,060, respectively.  However, this was false because the actual restated amounts were 10,350,000 and 10,238,122, respectively.

80.   These statements were not only false and/or misleading but they failed to disclose that: (i) the impact of the error on the financial statements as of and for the three and six month periods ended June 30, 2021, or as of and for the three and nine month periods ended September 30, 2021; (ii) the disclosures failed to mention that

treating this error as a restatement instead of a revision would require NGA or its successor company Embark to make adjustments to the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (iii) the disclosures failed to mention that NGA violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (iv) NGA and its successor Embark failed to maintain adequate internal controls.   As a result, the aforesaid public statements were materially false and misleading at all relevant times.

81.   The Definitive Proxy Statement was also false and misleading for the same reasons mentioned as to the Preliminary Proxy Statement because both of the statements have the same false information.

82.   The condensed financial statements as of June 30, 2020 were included in the Definitive Proxy Statement and in the Amendments to the Form S-4, which stated:

### NORTHERN GENESIS ACQUISITION CORP. II
### CONDENSED BALANCE SHEETS

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $   296,271 | $   — |
| Prepaid expenses and other current assets | 208,263 | — |
| Total Current Assets | 504,534 | — |
| Deferred offering costs | — | 249,917 |
| Marketable securities held in Trust Account | 414,023,366 | — |
| **TOTAL ASSETS** | **$414,527,900** | **$249,917** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $   640,600 | $   1,450 |
| Accrued offering costs | — | 107,000 |
| Promissory note — related party | — | 117,917 |
| Total Current Liabilities | 640,600 | 226,367 |
| FPA liability | 1,106,667 | — |
| Warrant liability | 34,956,801 | — |
| Deferred underwriting fee payable | 14,490,000 | — |
| **Total Liabilities** | **51,194,068** | **226,367** |
| **Commitments** | | |
| Common stock subject to possible redemption 41,400,000 and -0- shares at redemption value at June 30, 2021 and December 31, 2020, respectively | 414,000,000 | — |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — | — |
| Common stock, $0.0001 par value; 100,000,000 shares authorized; 15,805,951 and 10,350,000 shares issued and outstanding (excluding 35,944,049 and no shares subject to possible redemption) at June 30, 2021 and December 31, 2020, respectively | 1,035 | 1,035 |
| Additional paid-in capital | — | 23,965 |
| Accumulated deficit | (50,667,203) | (1,450) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NORTHERN GENESIS ACQUISITION CORP. II**
**CONDENSED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended June 30, 2021 | Six Months Ended June 30, 2021 |
|---|---|---|
| Operating and formation costs | $ 1,261,199 | $ 2,873,957 |
| **Loss from operations** | (1,261,199) | (2,873,957) |
| Other expense: | | |
| Change in fair value of warrant liability | (10,857,934) | (4,373,334) |
| Change in fair value of FPA liability | (140,000) | (140,000) |
| Loss on initial issuance of private warrants | — | (267,467) |
| Offering costs allocated to warrant and FPA liabilities | — | (1,148,289) |
| Interest earned on marketable securities held in Trust Account | 15,025 | 23,366 |
| Other expense, net | (10,982,909) | (5,905,724) |
| Loss before income taxes | (12,244,108) | (7,363,925) |
| Benefit (provision) for income taxes | — | — |
| **Net loss** | $(12,244,108) | $ (7,363,925) |
| Basic and diluted weighted average shares outstanding, Common stock subject to redemption | 37,153,752 | 61,945,851 |
| **Basic and diluted net income per share, Common stock subject to redemption** | $ 0.00 | $ 0.00 |
| Basic and diluted weighted average shares outstanding, Non-redeemable common stock | 14,596,248 | 14,393,060 |
| **Basic and diluted net income per share, Non-redeemable common stock** | $ (0.84) | $ (0.51) |

**NORTHERN GENESIS ACQUISITION CORP. II**
**CONDENSED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**THREE AND SIX MONTHS ENDED JUNE 30, 2021**
**(UNAUDITED)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings / (Accumulated Deficit) | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance — January 1, 2021** | 10,350,000 | $ 1,035 | $ 23,965 | $ (1,450) | $ 23,550 |
| Sale of 41,400,000 Units, net of underwriting discounts | 41,400,000 | 4,140 | 371,625,771 | — | 371,629,911 |
| Sale of 6,686,667 Private Placement Warrants | — | — | 10,963 | — | 10,963 |
| Common stock subject to possible redemption | (36,524,863) | (3,652) | (365,244,981) | — | (365,248,633) |
| Change in value of common stock subject to redemption | (628,889) | (63) | (6,295,906) | — | (6,295,969) |
| Net Income | — | — | — | 4,880,183 | 4,880,183 |
| **Balance — March 31, 2021** | 14,596,248 | $ 1,460 | $ 119,812 | $ 4,878,733 | $ 5,000,005 |
| Change in value of common stock subject to redemption | (4,246,248) | (425) | (119,812) | (42,335,161) | (42,455,398) |
| Initial classification of FPA liability | — | — | — | (966,667) | (966,667) |
| Net Loss | — | — | — | (12,244,108) | (12,244,108) |
| **Balance — June 30, 2021** | 10,350,000 | $ 1,035 | $ — | $(50,667,203) | $ (50,666,168) |

**NORTHERN GENESIS ACQUISITION CORP. II**
**CONDENSED STATEMENT OF CASH FLOWS**
**SIX MONTHS ENDED JUNE 30, 2021**
**(UNAUDITED)**

| | |
|---|---:|
| **Cash Flows from Operating Activities:** | |
| Net loss | $ (7,363,925) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Interest earned on marketable securities held in Trust Account | (23,366) |
| Changes in fair value of warrant liability | 4,373,334 |
| Change in fair value of FPA liability | 140,000 |
| Loss on initial issuance of private warrants | 267,467 |
| Offering costs allocable to warrant liabilities | 1,148,289 |
| Changes in operating assets and liabilities: | |
| Prepaid expenses and other current assets | (208,263) |
| Accrued expenses | 639,150 |
| Net cash used in operating activities | (1,027,314) |
| **Cash Flows from Investing Activities:** | |
| Investment of cash in Trust Account | (414,000,000) |
| Net cash used in investing activities | (414,000,000) |
| **Cash Flows from Financing Activities:** | |
| Proceeds from sale of Units, net of underwriting discounts paid | 405,720,000 |
| Proceeds from sale of Private Placement Warrants | 10,030,000 |
| Repayment of promissory note — related party | (117,917) |
| Payment of offering costs | (308,498) |
| Net cash provided by financing activities | 415,323,585 |
| **Net Change in Cash** | 296,271 |
| Cash — Beginning of period | — |
| **Cash — End of period** | $ 296,271 |
| **Non-Cash investing and financing activities:** | |
| Initial classification of common stock subject to possible redemption | $ 365,248,633 |
| Change in value of common stock subject to possible redemption | $ 48,751,367 |
| Initial Classification of Warrant Liabilities | $ 30,583,467 |
| Deferred underwriting fee payable | $ 14,490,000 |

## THE 2022 PROXY STATEMENT

## Defendant Robertson

- 22 -

83.    The 2022 Proxy Statement stated the following regarding Defendant Robertson:

>    **Ian Robertson** has served on our board since November 2021. One of NGA's founders, Mr. Robertson has served as its Chief Executive Officer and a member of its Board of Directors since its formation. He also served as the Vice Chair of the Board of Directors of Northern Genesis Acquisition I from June 2020 until consummation of its initial business combination in May 2021 and has served as Chief Executive Officer and a member of the Board of Directors of Northern Genesis Acquisition III since its formation in January 2021. Mr. Robertson is an active senior business professional and currently leads Northern Genesis Capital Corp., an infrastructure investment fund management company. In July 2021, he was appointed Co-Chair of the Board of Directors of Largo Resources Ltd. (TSX: LGO) (NASDAQ: LGO) and interim President of Largo Clean Energy Corp., a subsidiary of Largo Resources Ltd. Mr. Robertson co-founded APCI in 1988 and previously served as Chief Executive Officer and Director of Algonquin Power & Utilities Corp. from October 2009 through July 2020. During his leadership tenure, Algonquin grew to become one of Canada's largest power and utilities companies, serving regulated electricity, natural gas and water utility customers in the United States and Canada and owning and operating a large portfolio of global renewable wind and solar powered generation capacity. He has more than 30 years of experience in the origination and execution of global infrastructure investment initiatives and is committed to the concept of sustainable investing. Mr. Robertson previously served on the Board of Directors of Atlantica Sustainable Infrastructure plc (NASDAQ: AY), a publicly listed affiliate of Algonquin traded on the NASDAQ exchange.

Mr. Robertson received an electrical engineering degree from the University of Waterloo, a Master of Business Administration from York University, and a Master of Law from the Law School of the University of Toronto. He is a professional engineer and holds a Chartered Financial Analyst designation.

Skills and Qualifications: We believe Mr. Robertson is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Manget**

84.    The 2022 Proxy Statement stated the following regarding Defendant Manget:

The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their overallotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

85.    According to NGA's Registration Statement:

***Ken Manget***, one of our founders, has served as our Chief Financial Officer since June 2020. From 2014 to 2019, Mr. Manget served as Global Head, Relationship Investing at the Ontario Teachers' Pension Plan where he ran teams in Hong Kong, London and Toronto, and was responsible for a diversified portfolio of pre-IPO, public and private equity investments. After leaving Ontario Teachers' Pension Plan, he has been active as a private investor and director of companies. From 2009 to 2014, Mr. Manget served as Head of Investment Banking

at Desjardins Capital Markets. He started his career at Schlumberger, Inc. as a Field Engineer in Latin America. His finance background includes positions at: Salomon Brothers in London and New York (from 1986 to 1988), and at BMO Capital Markets in Toronto (from 1992 to 2009) where he had exposure to a broad range of capital markets/investment banking activities including: mergers & acquisitions, equities, fixed income, derivatives and securitization. Mr. Manget is a past board member of St. Joseph's Health Centre Foundation, the Heart and Stroke Foundation, is currently a member of the Board of the Canadian Ditchley Foundation, and serves an alumnus volunteer for Harvard University. He also currently serves on the Board of NASDAQ listed Organigram Holdings Inc. (NASDAQ: OIG) where he is a member of the audit, compensation and investment committees. He holds a Mechanical Engineering degree from the University of Toronto, a M.B.A from the Harvard Business School, and an ICD.D designation granted by the Institute of Corporate Directors, at the University of Toronto.

**Defendant Jarratt**

86.     The 2022 Proxy Statement stated the following regarding Defendant Jarratt:

The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their overallotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

87.     According to NGA's Registration Statement:

> ***Christopher Jarratt****,* one of our founders, has served as a member of our board of directors and our Non-Executive Chairman since June 2020. Mr. Jarratt is an active senior business professional. In 1988, he co-founded APCI, a private independent power developer formed in 1988 which was the predecessor organization to Algonquin Power & Utilities Corp. (TSX: AQN and NYSE: AQN), a publicly listed company traded on the TSX and NYSE, and has served as Executive Vice Chair for Algonquin Power & Utilities Corp. since October 2009. Mr. Jarratt brings more than 30 years of experience in the origination, development and operations of global infrastructure investment initiatives and is committed to the concept of best of class governance and sustainable investing. Mr. Jarratt currently serves on the Board of Directors of Atlantica Sustainable Infrastructure plc (formerly Atlantica Yield plc). Mr. Jarratt is a professional engineer and holds an engineering degree specializing in water resources from the University of Guelph. In addition, Mr. Jarratt holds the designation of Chartered Director from McMaster University. We believe Mr. Jarratt is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Dalglish**

88.     The 2022 Proxy Statement stated the following regarding Defendant Dalglish:

> The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial

public offering exercise their overallotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

89.     According to NGA's Registration Statement:

*Paul Dalglish*, one of our founders, has served as a member of our board of directors since June 2020. Mr. Dalglish is an experienced operations and information technology executive, specializing in the design and delivery of systems providing operational excellence. Mr. Dalglish brings global experience in the delivery of technology-enabled transformations with global clients and has led large global employee and contractor teams. He has led business development and contract negotiation teams for large outsourcing contracts. Since June 2019, Mr. Dalglish has served as Vice President of Operations for JANA Corporation, a utility services company providing risk assessment programs to the North American natural gas industry. From 2016 to August 2019, Mr. Dalglish served as President of Hibernia Solutions Inc., a provider of pre- and post-acquisition support to utilities and utility related companies. From 2008 to 2015, Mr. Dalglish was with Serco Canada Inc., a multi-national government outsourcing company, initially serving as a Director of its subsidiary Serco-DES Inc. and later serving as its President. Previously, Mr. Dalglish focused on the acquisition and integration of new businesses on behalf of Accenture's utility outsourcing business.

Mr. Dalglish previously served on the Board of Directors and Audit Committee for AirSource Power Fund I LP, a publicly listed renewable energy company and currently sits on the Boards of several not-for-profit organizations. Mr. Dalglish has been accredited as a Chartered Director by McMaster University, holds a Professional

Engineer designation through his Bachelor of Science from the University of Waterloo and has been awarded a Master of Business Administration from the University of Western Ontario. We believe Mr. Dalglish is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Schaefer**

90.     The 2022 Proxy Statement stated the following regarding Defendant Schaefer:

The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their overallotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

91.     According to NGA's Registration Statement:

***Robert Schaefer,*** one of our founders, has served as a member of our board of directors since July 2020. Mr. Schaefer is an active business professional. Since 2017, he has served as the Executive Vice President and Chief Financial Officer for the Ascendant Group Limited, the parent of Bermuda Electric Company. Mr. Schaefer is an executive with a track record of repositioning and growing businesses through his experience leading business units, undertaking mergers and acquisitions and completing finance transactions in Bermuda, Canada, U.S. and Europe. Mr. Schaefer has been responsible for significant capital deployment in growth investments, negotiation of long-term contract restructurings and company sales and acquisitions. From 2015 to 2017, Mr. Schaefer led

the strategic restructuring of Maxim Power Corp. including the successful divestiture of European and US power businesses. From 2008 through 2015, Mr. Schaefer was responsible for TransAlta Corporation's energy marketing business unit and business development activities. Mr. Schaefer holds a Bachelors of Commerce from the University of Calgary and is a member of the Institute of Chartered Accountants of Alberta and Bermuda. We believe Mr. Schaefer is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Sparkes**

92.     The 2022 Proxy Statement stated the following regarding Defendant Sparkes:

The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their overallotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

93.     According to NGA's Registration Statement:

***Brad Sparkes***, one of our founders, has served as a member of our board of directors since June 2020. Mr. Sparkes is an active senior business professional. He co-founded and has served as President and Chief Executive Officer for BowArk Energy Ltd, a wind energy developer, since September 2003. Since its inception, BowArk has successfully developed a number of renewable energy projects across Canada. Mr. Sparkes previously held the position of Chief Financial

Officer and Director for AirSource Power Fund LP which successfully completed the construction of the St. Leon Wind Energy Facility. Prior to BowArk, Mr. Sparkes gained extensive experience in developing and financing power projects across North America. From 2000 to 2003, Mr. Sparkes was Director of Business Development of Calpine Canada where he led its acquisitions and development team focusing on the natural gas-fired energy sector successfully developing and financing a number of projects in the North American energy sector. Prior to joining Calpine, he was a member of TransAlta Energy Corporation's business development team from 1996 to 2000, also focusing on natural gas fired energy sector in Canada. Mr. Sparkes holds an Engineering degree from the University of Calgary. We believe Mr. Sparkes is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Rodrigues**

94.    The 2022 Proxy Statement stated the following regarding Defendant Rodrigues:

*Alex Rodrigues* co-founded Embark and has served as our Chief Executive Officer since the company's founding in 2016. Mr. Rodrigues has an extensive background in robotics, beginning with a world robotics championship win as a middle school student in 2009. Mr. Rodrigues studied at the University of Waterloo, where he built Canada's first self-driving vehicle, a golf cart that was used to take guests on tours of the campus. Mr. Rodrigues is a 2016 Thiel Fellowship recipient and was accepted into Silicon Valley startup incubator Y-Combinator, where he launched Embark. Under Mr. Rodrigues's tenure as Chief Executive Officer, Embark has achieved a number of industry firsts as it commercializes autonomous freight: Embark was the first self-driving

truck company to achieve an autonomous coast-to-coast drive, the first to reach 100,000 miles driven on public roads, and the first to open transfer points.

**Skills and Qualifications**: We believe that Mr. Rodrigues is highly-qualified to serve as a member of our board of directors due to his longtime leadership of our company, deep business experience in the autonomous trucking sector, and technical expertise in robotics.

**Defendant Hawwa**

95.    The 2022 Proxy Statement stated the following about Defendant Hawwa:

**Richard Hawwa** has served as our Chief Financial Officer since May 2021.bMr. Hawwa has more than 15 years of investment banking experience. Prior to joining us, Mr. Hawwa most recently served as a Managing Director at Citigroup, responsible for coverage of a variety of industrial and technology companies across the global mobility sector. Mr. Hawwa began his career as an analyst in the investment banking division at UBS. Throughout his career, Mr. Hawwa's primary responsibilities included working with companies assisting on capital raising transactions and advising on strategic matters. Prior to assuming mobility sector coverage responsibility, Mr. Hawwa specialized in M&A, working across a diverse set of disruptive and traditional sectors, including biotechnology, medical device technology, financial technology, diversified industrials and energy. Mr. Hawwa has advised and assisted on a variety of complex transactions with an aggregate transaction value of more than $125 billion in North America, Europe and Asia. Mr. Hawwa graduated in three years with honors from Southern Methodist University with a Bachelor of Business Administration in Finance and a minor in Economics.

**Defendant Chao**

96.     The 2022 Proxy Statement stated the following about Defendant Chao:

***Secretary Elaine Chao*** has served on our board since November 2021 and has also served as a member of Embark Trucks Inc.'s board of directors from June 2021. Secretary Chao is the former U. S. Secretary of Labor and the former U.S. Secretary of Transportation. She is the first Asian Pacific American woman to be appointed to a President's cabinet in American history. Prior to being appointed Secretary of Labor, she was President and CEO of United Way of America, Director of the Peace Corps, Deputy Secretary of U.S. Department of Transportation, Chair of the Federal Commission. She has also worked in the private sector as vice president of Syndications for BankAmerica Capital Markets Group and Citibank. Secretary Chao has also been a director on a number of Fortune 100 public and nonprofit boards. She is recipient of 37 honorary doctorate degrees. Secretary Chao has a MBA from Harvard Business School.

**Skills and Qualifications**: We believe Secretary Chao's extensive leadership experience in high profile positions at large, complex organizations in the public, private and non-profit sectors brings valuable perspective to matters relevant to the Company in the areas of global competitiveness, international geopolitical dynamics, workforce development, trends in governmental policies and corporate governance. In particular, Secretary Chao's service as U.S. Secretary of Transportation provides extensive knowledge and experience regarding safety, and the importance of innovation and infrastructure in our nation's economic competitiveness. Her service as U.S. Secretary of Labor provides extensive knowledge and experience regarding labor and employment trends, workforce health and safety, pension benefits and

1   competition in a worldwide economy. Secretary Chao's ongoing board

2   memberships in the financial and communications industries also

3   provide further insight into finance, macroeconomics and new media

4   developments.

5   **Defendant Grady**

6       97.    The 2022 Proxy Statement stated the following about Defendant Grady:

7           *Pat Grady* has served on our board since November 2021 and has

8   also served as a member of Embark Truck Inc.'s board of directors from

9   May 2018. Mr. Grady currently serves as a Partner at Sequoia Capital,

10  which he joined in 2007, and is responsible for Sequoia Capital's

11  growth-stage investment business. Mr. Grady is an active senior business

12  professional, and currently serves as a director of multiple companies,

13  including, Amplitude, Attentive, Cribl, Drift, Namely, Okta (OKTA),

14  and Pilot. These ongoing memberships provide insight into the enterprise

15  technology and financial services industry and developments. During his

16  career, he has also worked with companies such as HubSpot (HUBS),

17  Jive Software, MarkLogic, Medallia (MDLA), OpenDNS, Qualtrics

18  (XM), ServiceNow (NOW), Snowflake (SNOW), Sumo Logic (SUMO),

19  Sunrun (RUN), and Zoom (ZM), among others. Mr. Grady received a

20  Bachelor of Science degree from Boston College.

21          **Skills and Qualifications**: We believe Mr. Grady is well-

22  qualified to serve on our board of directors due to his extensive

23  experience in working with and serving at the boards of growth-stage

24  businesses.

25  **Defendant Moak**

26      98.    The 2022 Proxy Statement said the following about Defendant Moak:

27          *Brandon Moak* co-founded Embark and has served as our Chief

28  Technology Officer since the company's founding in 2016. In his role,

- 33 -

he leads engineering and R&D at our company, and has overseen development of the Embark Driver software, the core of Embark's commercialization effort. Mr. Moak has also led the design and development of the Embark Universal Interface, a first-of-its-kind set of standardized self-driving components and flexible interfaces necessary for major truck OEMs to more easily and robustly integrate Embark's autonomous technology onto their vehicle platforms. Mr. Moak previously worked as a robotics engineer and a software developer, respectively, at technology companies Kindred.ai and Clear Blue Technologies. Mr. Moak is an alumnus of the University of Waterloo where he studied mechatronics engineering. Mr. Moak has served on our board of directors since our inception and will continue in this role.

**Skills and Qualifications**: We believe Mr. Moak is highly-qualified to serve as a member of our board of directors due to his longtime leadership of research and development at the company, deep business experience in the autonomous trucking sector, and technical expertise in robotics.

## **THE THRUTH IS REVEALED**

99.   On November 9, 2021, the Company held a special meeting where the NGA shareholders approved the Merger.

**November 10, 2021, Form 10-Q**

100.   On November 10, 2021, Embark filed its third quarter 2021 financial statements ("3Q21"). The 3Q21 was signed by Defendant Robertson and Manget, and contained SOX certifications signed by Defendants Robertson and Manget attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

101.   In the 3Q21, the Company disclosed the accounting error related to temporary equity versus permanent equity.  Note 2 of the 3Q21 stated:

> NOTE 2. REVISION OF PREVIOUSLY ISSUED FINANCIAL STATEMENTS
>
> In connection with the preparation of the Company's financial statements as of September 30, 2021, management identified errors made in its historical financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its Common stock subject to possible redemption. The Company previously determined the Common stock subject to possible redemption to be equal to the redemption value of $10.00 per share of Common stock while also taking into consideration a redemption cannot result in net tangible assets being less than $5,000,001. Management determined that the Common stock issued during the Initial Public Offering can be redeemed or become redeemable subject to the occurrence of future events considered outside the Company's control. Therefore, management concluded that the redemption value should include all shares of Common stock subject to possible redemption, resulting in the Common stock subject to possible redemption being equal to their redemption value. As a result, management has noted a reclassification error related to temporary equity and permanent equity. This resulted in an adjustment to the initial carrying value of the Common stock subject to possible redemption with the offset recorded to additional paid-in capital (to the extent available), accumulated deficit and Common stock.  However, the reclassification error was significantly major than what the company presented it to be.

102.   This disclosure failed to address that the error would require the Company to restate the amounts disclosed in its previous financial statements as opposed to making only a revision to the January 15, 2021 financial statement.

103.   This disclosure also failed to address the fact that the Company violated GAAP rules in place since 2009 and which were know or should have been known to the Individual Defendants.

104.   The statements referenced above were materially false and misleading because there were material errors that required Embark to now issue a restatement for its financial statements to be in accordance with GAAP and Defendants failed to disclose that: (i) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (ii) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (iii) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (iv) the Company failed to maintain adequate internal controls.   As a result, Embark's public statements were materially false and misleading at all relevant times

**November 17, 2021, Form 8-K**

105.   On November 17, 2021, the Company filed a November 2021 8-K.  The November 2021 8-K disclosed that Company's "audited balance sheet as of January 15, 2021 and the Company's unaudited financial statements as of March 31, 2021 and for the three months ended March 31, 2021 should no longer be relied upon."

106.   The Company admitted those statements are unreliable because of the reclassification of all the Company's public shares as temporary equity.

Item 4.02.   Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

On November 12, 2021, the management of Embark Technology, Inc. … became aware that the Chief Accountant's Office of the

Securities and Exchange Commission's ("SEC") Division of Corporation Finance had determined that the redeemable common shares should all be recorded as temporary equity…. The Company had previously classified a portion of the Public Shares in permanent equity because the Company's amended and restated certificate of incorporation provided that the Company will not redeem the Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. Notwithstanding the provision in the amended and restated certificate of incorporation requiring a minimum net tangible asset amount, based on the re-evaluation discussed above, the Company's management determined that, in accordance with the ASC 480, redemption provisions not solely within the control of the Company would require common stock subject to redemption to be classified outside of permanent equity and therefore all of the Public Shares subject to redemption should be classified outside of permanent equity.

On November 17, 2021, the audit committee of the board of directors of the Company concluded, after discussion with the Company's management, that (i) the Company's audited balance sheet as of January 15, 2021 included as Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on January 22, 2021 and (ii) the Company's unaudited financial statements as of March 31, 2021 and for the three months ended March 31, 2021 contained in the Company's Quarterly Report on Form 10-Q filed with the SEC on May 26, 2021, should no longer be relied upon due to the reclassification of all of the Company's Public Shares as temporary equity.

The tables below present sections of (i) the balance sheets as of January 15, 2021 and March 31, 2021, (ii) the statement of operations for the three months ended March 31, 2021 and (iii) the statement of cash

flows for the three months ended March 31, 2021, in each case, as reported, adjusted for the change in accounting treatment and the restated financial statements reflecting those adjustments.

Balance Sheet as of January 15, 2021

|  | As Reported | Adjustments | Restated |
|---|---|---|---|
| Shares Subject to Redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Class A Common Stock | 1,523 | (488) | 1,035 |
| Additional Paid in Capital | 6,415,718 | (6,415,718) | - |
| (Accumulated Deficit) Retained Earnings | (1,417,296) | (42,335,161) | (43,752,397) |
| Total Stockholders' Equity | 5,000,005 | (48,751,367) | (43,751,362) |
| Number of shares subject to redemption | 36,524,863 | 4,875,137 | 41,400,000 |

2

Balance Sheet as of March 31, 2021

|  | As Reported | Adjustments | Restated |
|---|---|---|---|
| Shares Subject to Redemption | $ 371,544,602 | $ 42,455,398 | $ 414,000,000 |
| Class A Common Stock | 1,460 | (425) | 1,035 |
| Additional Paid in Capital | 119,812 | (119,812) | - |
| (Accumulated Deficit) Retained Earnings | 4,878,735 | (42,335,161) | (37,456,426) |
| Total Stockholders' Equity | 5,000,005 | (42,455,398) | (37,455,393) |
| Number of shares subject to redemption | 37,153,752 | 4,246,248 | 41,400,000 |

Statement of Operations for the three months March 31, 2021

|  | As Reported | Adjustments | Restated |
|---|---|---|---|
| Weighted average shares outstanding - redeemable | 36,524,863 | (2,024,863) | 34,500,000 |
| Basic and Diluted EPS - redeemable | $ 0.34 | $ 0.11 | $ 0.11 |
| Weighted average shares outstanding - non-redeemable | 14,187,614 | (4,062,614) | 10,125,000 |
| Basic and Diluted EPS - non-redeemable | $ 0.34 | $ (0.23) | $ 0.11 |

Statement of Cash Flows for the three months March 31, 2021

|  | As Reported | Adjustments | Restated |
|---|---|---|---|
| Initial classification of common stock subject to redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Change in value of common stock subject to redemption | 6,295,969 | (6,295,969) | - |

The Company reflected the adjustments to the Company's financial statements as of January 15, 2021 in Note 2 of the financial statements included in the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2021, filed with the SEC on November 10, 2021 (the "Q3 10-Q"). ***The Company referred to these adjustments as a 'revision' in the Company's Q3 10-Q, however, these adjustments should have been identified as a 'restatement' of the previously issued audited balance sheet.*** Notwithstanding the misidentification, management believes that the financial statements included in the Q3 10-Q present fairly in all material respects the Company's financial position, results of operations and cash flows for the periods presented.

The Company's management has concluded that at the time the abovementioned financial statements were issued, in light of the classification error described above, ***a material weakness existed in the Company's internal control over financial reporting with respect to its analysis of complex financial instruments, including the classification of redeemable common stock as temporary equity***. However, the errors relate to the pre- business combination special purpose acquisition company and its financial statements and the Company's management believes that these errors have no material effect on the post-business combination company's financial statements.  [Emphasis added].

107.   After this news came out, the Company's share price fell to $7.173 per share on the close of November 18, 2021, which is a fall of $0.72 per share or approximately 9%.

**November 24, 2021 Form 10-Q**

108.   The Company filed an Amended 3Q21 on November 24, 2021. The Amended 3Q21 was signed by Defendant Rodrigues and Hawwa and contained SOX certifications signed by Defendants Rodrigues and Hawwa attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109. In the Amended 3Q21, the Company disclosed that it issued a restatement for its condensed financial statements as of January 15, 2021, as of and for the three-month period ended March 31, 2021, as of and for the three and six month periods ended June 30, 2021, and for three and nine month periods ended September 30, 2021 because it made an accounting error in classifying the redeemable common stock.

The Company is filing this First Amendment on Form 10-Q/A to reflect a restatement of the Company's condensed financial statements

as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021 and for the three and nine months ended September 30, 2021 to correct errors in the Company's classification of public shares as permanent equity *as further described* below.

***

**Background of Restatement**

*In the Company's previously issued financial statements as of January 15, 2021 and March 31, 2021, a portion of the public shares were classified as permanent equity to maintain stockholders' equity greater than $5,000,000 on the basis that the Company could consummate its initial business combination only if the Company has net tangible assets of at least $5,000,001 under the Company's charter. Thus, the Company can only complete a merger and continue to exist as a public company if there are sufficient public shares that do not redeem at the merger and so it was deemed appropriate to classify the portion of its public shares required to keep its stockholders' equity above the $5,000,000 threshold as "shares not subject to redemption."*

However, in light of recent comment letters issued by the Securities & Exchange Commission ("SEC") to several special purpose acquisition companies, management re- evaluated the Company's application of ASC 480-10-99 to its accounting classification of public shares. Upon reevaluation, management determined that the public shares include certain provisions that require classification of the public shares as temporary equity regardless of the minimum net tangible asset required by the Company to complete its initial business combination.

*The Company's management and the audit committee of the Company's Board of Directors concluded that it is appropriate to*

*restate all of the Company's previously issued financial statements to report all public shares as temporary equity as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021 and for the three and nine months ended September 30, 2021.*

\*\*\*

*Refer to Note 2, Restatement of Previously Issued Financial Statements of this Form 10-Q/A for additional information and for the summary of the accounting impacts of these adjustments to the Company's condensed financial statements* as of and for the three months ended March 31, 2021*, as of and for the three and six months ended June 30, 2021* and for the three and nine months ended September 30, 2021.

The Company previously identified a material weakness in internal controls related to the accounting for warrants issued in connection with our initial public offering. *As a result of the restatement described in this First Amendment on Form 10-Q/A, the Company has concluded there was a material weakness in the Company's internal control over financial reporting at the time the abovementioned financial statements were issued, and its disclosure controls and procedures were not effective at the time the abovementioned financial statements were issued*. [Emphasis added].

110. Note 2 to the Condensed Consolidated Financial Statements for September 30, 2021 provided additional information for the Restatement:

NOTE 2.  RESTATEMENT OF PREVIOUSLY ISSUED FINANCIAL STATEMENTS

In connection with the preparation of the Company's financial statements as of September 30, 2021 in its Original Form 10-Q, the

Company concluded it should restate its financial statements to classify all Public Shares in temporary equity. In accordance with ASC 480, paragraph 10-S99, redemption provisions not solely within the control of the Company require common stock subject to possible redemption to be classified outside or permanent equity. The Company previously determined the common stock subject to possible redemption to be equal to the redemption value of $10.00 per share of common stock while also taking into consideration a redemption cannot result in net tangible assets being less than $5,000,001.

*Previously, the Company did not consider redeemable shares classified as temporary equity as part of net tangible assets. Effective with these financial statements, the Company revised this interpretation to include temporary equity in net tangible assets. Accordingly, effective with this filing, the Company presents all redeemable common stock as temporary equity.*

*Additionally, the Company in its Original Form 10-Q referred to these adjustments as a 'revision', however, these adjustments should have been identified as a 'restatement' of the previously issued financial statements.*

As a result, management has noted a reclassification adjustment related to temporary equity and permanent equity. This resulted in an adjustment to the initial carrying value of the common stock subject to possible redemption with the offset recorded to additional paid-in capital (to the extent available), accumulated deficit and common stock. [Emphasis added].

111.   The impact of the restatement on the financial statements is reflected in the following table:

| | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| **Balance Sheet as at of January 15, 2021** | | | |
| Common stock subject to redemption | $ 365,248,533 | $ 48,751,367 | $ 414,000,000 |
| Common stock shares | 1,523 | (488) | 1,035 |
| Additional paid-in capital | $ 6,415,718 | $ (6,415,718) | $ — |
| Accumulated deficit | $ (1,417,236) deficit | $ (42,335,161) | $ (43,752,397) |
| Total Stockholders' Equity (Deficit) | $ 5,000,005 | $ (48,751,367) | $ (43,751,362) |
| **Balance Sheet as of March 31, 2021** | | | |
| Common stock subject to possible redemption | 371,544,602 | 42,455,398 | 414,000,000 |
| Common stock shares | 1,460 | (425) | 1,035 |
| Additional paid-in capital | 119,812 | (119,812) | — |
| Retained Earnings (Accumulated deficit) | 4,878,733 | (42,335,161) | (37,456,428) |
| Total Stockholders' Equity (Deficit) | 5,000,005 | (42,455,398) | (37,455,393) |

| | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| **Statement of Cash Flows for the Three Months Ended March 31, 2021** | | | |
| Initial classification of common stock subject to possible redemption | 365,248,633 | 48,751,367 | 414,000,000 |
| Change in value of common stock subject to redemption | 6,295,969 | (6,295,969) | — |
| **Statement of Cash Flows for the Six Months Ended June 30, 2021** | | | |
| Initial classification of common stock subject to possible redemption | 365,248,633 | 48,751,367 | 414,000,000 |
| Change in value of common stock subject to redemption | 48,751,367 | (48,751,367) | — |

| | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| **Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit) March 31, 2021** | | | |
| Sale of 41,400,000 Units, net of underwriting discounts | $ 371,629,911 | $ (371,629,911) | $ — |
| Initial value of common stock subject to possible redemption at IPO date | (365,248,633) | 365,248,633 | — |
| Change in value of common stock subject to redemption | 6,295,969 | (6,295,969) | — |
| Accretion for common stock to redemption amount | — | (42,359,126) | (42,359,126) |
| Total stockholders' equity (deficit) | 5,000,005 | (42,455,398) | (37,455,393) |
| **Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit) June 30, 2021** | | | |
| Change in value of common stock subject to redemption | 42,455,398 | (42,455,398) | — |
| Total stockholders' equity | (50,666,168) | — | (50,666,168) |

In connection with the change in presentation for common stock subject to redemption, the Company also restated its income (loss) per share. The impact of this restatement on the Company's financial statement is reflected in the following table:

| | Basic and diluted weighted average shares outstanding, Class A common stock subject to possible redemption | Basic and diluted net loss per share, Class A common stock | Basic and diluted weighted average shares outstanding, Class B common stock subject to possible redemption | Basic and diluted net loss per share, Class B common stock |
|---|---|---|---|---|
| **For the three months ended, March 31, 2021** | | | | |
| As Previously Reported | 36,524,863 | $ — | 14,187,614 | $ 0.34 |
| As Restated | 34,500,000 | $ 0.11 | 10,125,000 | $ 0.11 |
| **For the three months ended, June 30, 2021** | | | | |
| As Previously Reported | 37,153,752 | $ (0.84) | 14,596,248 | $ (0.84) |
| As Restated | 41,400,000 | $ (0.24) | 10,350,000 | $ (0.24) |
| **For the six months ended, June 30, 2021** | | | | |
| As Previously Reported | 61,945,851 | $ (0.51) | 14,393,060 | $ (0.51) |
| As Restated | 37,969,061 | $ (0.15) | 10,238,122 | $ (0.15) |
| **For the three months ended, September 30, 2021** | | | | |
| As Previously Reported | 51,750,000 | $ 0.22 | — | $ — |
| As Restated | 41,400,000 | $ 0.22 | 10,350,000 | $ 0.22 |
| **For the nine months ended, September 30, 2021** | | | | |
| As Previously Reported | 48,906,593 | $ 0.09 | — | $ — |
| As Restated | 39,125,275 | $ 0.08 | 10,275,824 | $ 0.08 |

112.   The Company's condensed financial statements as of and for the three and six month periods ended June 30, 2021, disclosed that previous financial statements should not be relied upon, including the Preliminary Proxy Statement/Prospectus. The Company restated the material changes in financial statements as of and for the three and six month periods ended June 30, 2021.

113.   Moreover, due to the improper accounting, the Company materially misstated its EPS in their financial statements as of and for the three and six month periods ended June 30, 2021. The Company failed to indicate that there was a revision or restatement required for either of those periods in its 3Q21 and the November 2021 8-K public statements.

114.   After the Amended 3Q21 was released, the Company's shares fell to a close at $8.01 per share on November 24, 2021, which is a fall of $0.51 or approximately 6% from the previous close.

## **CORPORATE GOVERNANCE**

115.   As members of the Board, each of the director Defendants were required to follow the Code of Ethics, the corporate governance guidelines and the charters of each committee of the Board of Directors in place at the time they served.

116.   Defendants failed to do so.

### **NGA Code of Ethics**

117.   In NGA's Registration Statement, NGA stated with regards to its "Code of Ethics" that:

> Prior to the effectiveness of this registration statement of which this prospectus forms a part, we will have adopted a Code of Ethics applicable to our directors, director nominees, officers and employees. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See "Where You Can Find Additional Information."

### **Embark's Code of Conduct**

118.   The introduction to Embark's Code of Conduct reads, in relevant part:

> This Code of Business Conduct and Ethics (the "Code") contains general guidelines for conducting the business of Company Technology, Inc. (the "Company" or "we") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

119.   The Code of Conduct's introduction continues by stating that it "applies to our Directors, officers, and other employees (including employees we engage through certain third parties in jurisdictions outside the United States)."

120.   The Code of Conduct instructs regarding the accuracy of the Financial Reports and Other Public Communications:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

121.    The Code of Conduct instructs that Company should have "Accurate and reliable" records and further states:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your

- 45 -

supervisor or the Company's Chief Legal Officer to obtain a copy of any such policy or with any questions concerning any such policy.

122.   The Code of Conduct instructs that Embark personnel must "act in the best interests of the Company" and further stated that:

> You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

123.   Finally, the Code of Conduct states with regards to violation of Code of Conduct is that:

> It is Company policy that any employee or director who violates this Code will be subject to appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company (the "Board of Directors"). This determination will be based upon the facts and circumstances of each particular situation. If you are accused of violating this Code, you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline. Employees and directors who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community. Your conduct as a representative of the Company, if it does not comply

with the law or with this Code, can result in serious consequences for both you and the Company.

**NGA Audit Committee Charter**

124. In NGA's Registration Statement, NGA stated with regards to its "Audit Committee Charter" that:

> We will adopt an audit committee charter, which will detail the principal functions of the audit committee, including:
>
> - the appointment, compensation, retention, replacement, and oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us;
>
> - pre-approving all audit and non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;
>
> - reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence;
>
> - setting clear hiring policies for employees or former employees of the independent auditors;
>
> - setting clear policies for audit partner rotation in compliance with applicable laws and regulations;
>
> - obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities, within, the preceding

five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues;

- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and

- reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

**Embark's Audit Committee Charter**

125.   The Charter of the Audit Committee of the Board of Directors of Embark, Inc. (the "Audit Committee Charter") defines the responsibilities of the Board's Audit Committee.

126.   Per the Audit Committee Charter, the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company." It further states that:

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

127. The Audit Committee Charter lists among the Audit Committee's responsibilities:

> *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention, oversight of the work and assessment of qualifications, performance and independence of our independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee.

> The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules

> * * *

> *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

> *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements and related disclosures, as well as critical accounting policies, with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

*Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\* \* \*

*Internal Control Over Financial Reporting*. The Committee must review the adequacy of the Company's internal control over financial reporting.

\* \* \*

*Review of Code of Business Conduct and Ethics*. The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code"), the procedures in place to enforce the Code. Reports to the Board of Directors.

\* \* \*

The Committee must report regularly to the Board regarding the activities of the Committee.

## DUTIES OF THE EMBARK DEFENDANTS

128.   As members of the Company's Board, the Embark Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

129.   The conduct of the Embark Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Embark Defendants were aware posed a risk of serious injury to the Company.

130.   By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Embark Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Embark Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Embark Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

131.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Embark Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

132.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other

things:

    (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    (d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

    (e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

    (f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

133.   Each Embark Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of

its property and assets.  The conduct of the Embark Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Embark Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

134.   The Embark Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## AIDING AND ABETTING

135.   In committing the wrongful acts alleged herein, the NGA Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.

136.   The NGA Defendants caused the Company to conceal the true facts as alleged herein. The NGA Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

137.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the NGA Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

138.   The NGA Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the NGA Defendants collectively and individually took the actions set forth herein.

139.   Each of the NGA Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

140.   Each of the NGA Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the NGA Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

141.   At all times relevant hereto, each of the NGA Defendants was the agent of each of the other NGA Defendants and at all times was acting within the course and scope of such agency.

### **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

142.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

143.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

144.   Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

145.   The Company Board is currently comprised of seven (7) directors: Robertson, Rodrigues, Moak, Chao, Grady, and non-party directors Chiodo and Herscher.   Thus, Plaintiff is required to show that a majority of the Director

Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

146.   The Embark Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

147.   The Embark Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

148.   Each of the Embark Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

149.   Each of the Embark Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

150.   Additionally, each of the Embark Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DAMAGES TO EMBARK

151.   As a direct and proximate result of the Individual Defendants' misconduct, Embark has lost and expended, and will lose and expend, many millions of dollars.

152.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company.

153.   Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Overpayment Misconduct.

154.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Embark Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Embark Defendants who breached their fiduciary duties to the Company.

155.   As a direct and proximate result of the Individual Defendants' conduct, Embark has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## FIRST CAUSE OF ACTION

### Against The Embark Defendants for Breach of Fiduciary Duties

156.   Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

157.   The Embark Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Embark Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

158.   The Embark Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

159.   The Embark Defendants engaged in a sustained and systematic failure to

properly exercise their fiduciary duties. Among other things, the Embark Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160. As a direct and proximate result of the Embark Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Embark Defendants are liable to the Company.

161. As a direct and proximate result of the Embark Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Violations of Section 14(a) of the Exchange Act

### Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer and Sparkes for Violations of Section 14(a) of the Exchange Act

162. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

164. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

165. Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer and Sparkes caused the Definitive Proxy Statement to be false and misleading: (i) by failing to abide by the GAAP rules in classifying the redeemable public shares, (ii) by failing to abide by the Code of Ethics; and (iii) by reaching an agreement to merge with Legacy Embark without adequate due diligence.

166. Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer and Sparkes caused the Definitive Proxy Statement to be false and misleading by failing to disclose that the Code of Ethics was not abided by as evinced by the accounting errors discussed herein and the fact that the NGA Defendants were engaging in the Overpayment Misconduct, soliciting the Merger with Legacy Embark without having conducted adequate due diligence.

167. Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer and Sparkes caused the Definitive Proxy Statement to be materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it contained material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP and failed to disclose that: (i) the impact of the error on the Company's financials as of and for the three and six month periods ended June 30, 2021, or as of and for the three and nine month periods ended September 30, 2021; (ii) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in

the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (iii) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls.

168.   As a result, Embark's public statements were materially false and misleading at all relevant times. The Company was damaged as a result of Defendants Robertson,    Manget,    Dalglish,    Jarratt,    Schaefer,    and    Sparkes    material misrepresentations and omissions in the Definitive Proxy Statement.

### THIRD CAUSE OF ACTION

### Against The Embark Defendants for Gross Mismanagement

169.   Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

170.   By their actions alleged herein, the Embark Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

171.   As a direct and proximate result of the Embark Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

172.   Because of the misconduct and breaches of duty alleged herein, the Embark Defendants are liable to the Company.

### FOURTH CAUSE OF ACTION

### Against the Embark Defendants for Waste of Corporate Assets

173.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the

Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

175. As a result of the misconduct described above, the Embark Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

176. As a result of the waste of corporate assets, the Embark Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

### (Against The Individual Defendants For Unjust Enrichment)

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

179. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

180. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

181.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of said Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  November 30, 2022

**MAGNANIMO DEAN LAW, APC**

*/s/ Lauren A. Dean*
Lauren A. Dean, Esq. (SBN 174722)
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Email: lauren@magdeanlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Robert Manning II, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Embark Technology, Inc. f/k/a Northern Genesis Acquisition Corp. II and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Embark Technology, Inc. f/k/a Northern Genesis Acquisition Corp. II common stock at all relevant times.


Robert Manning II